**In re BULLION RESERVE OF NORTH AMERICA, a California Corporation, Debtor.**

**Curtis B. DANNING, Chapter 7 Trustee, Plaintiff–Appellee,**

v.

**Michael L. MILLER, Defendant–Appellant.**

No. 89–55375.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 1, 1990.

Decided Jan. 4, 1991.

Michael Miller, Pro Per, Beverly Hills, Cal., for defendant-appellant.

Jeffrey C. Krause, Stutman, Treister & Glatt, Los Angeles, Cal., for plaintiff-appellee.

Before BOOCHEVER, BEEZER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

This dispute arose from a transaction in which Alan Saxon, the president of Bullion Reserve of North America ("BRNA"), agreed to contribute $1.5 million to The Commercial Bank of California ("CBC") in exchange for an ownership interest in CBC.

Arnold Kopelson and Michael Miller were members of CBC's Board of Directors. CBC was desperately in need of capital, and Kopelson approached Saxon for a capital contribution. Saxon agreed. He caused BRNA to transfer $1.5 million to his personal account, and in turn made a non-recourse loan of $1.5 million to Miller and Kopelson. The money was placed in Kopelson's personal bank account, and used to purchase stock in Kopelson's and Miller's names. In accordance with the controlling agreement, the stock was immediately pledged to Saxon as security for the loan.

BRNA then filed a petition under Chapter 7 of the Bankruptcy Code. During the liquidation proceedings, Curtis B. Danning, bankruptcy trustee for BRNA, and Saxon's estate stipulated the initial transfer from BRNA to Saxon was fraudulent under 11 U.S.C. § 548. Danning then brought an adversary proceeding against Miller under 11 U.S.C. § 550, which allows a bankruptcy trustee to recover a debtor's fraudulent transfers from certain classes of "transferees." The bankruptcy court, by way of partial summary judgment, awarded $1.5 million to the trustee, finding that Miller was a "transferee" from whom the trustee could recover. The district court affirmed, and Miller now appeals. We have jurisdiction under 28 U.S.C. § 158(d), and we reverse.

I

In November 1982, the California State Banking Department advised CBC to increase its capital. At that time, Arnold Kopelson and Michael Miller were serving on CBC's Board of Directors. Kopelson telephoned Alan Saxon, president of BRNA, to discuss the possibility of an investment in CBC. Saxon agreed to contribute $1.5 million in exchange for an ownership interest in CBC.

CBC could not simply sell stock to Saxon. Obtaining a permit to issue shares directly to Saxon would take weeks or months to be approved. Kopelson believed quick action was necessary because he had been advised by the California State Banking Department and the FDIC that the need for capital was immediate. Without fresh capital, CBC could be closed in a matter of days. Kopelson knew CBC could obtain immediate permission to issue 50,000 shares to himself and 50,000 shares to Miller because they were both members of CBC's Board of Directors. To avoid delay, Kopelson and Saxon agreed the shares would not be issued directly to Saxon, but to Kopelson and Miller "for Saxon's benefit."

In two separate deposits, Saxon transferred $1.5 million from BRNA to his personal account at CBC. Saxon then made a non-recourse loan of $1.5 million to Kopelson and Miller, secured by an "assignment and transfer" of 100,000 shares of CBC stock, to be purchased by Kopelson and Miller. The loan was evidenced by a "Nonrecourse Promissory Note and Collateral Pledge Agreement" (the "Nonrecourse Note"). Additionally, in a letter dated December 15, 1982, Kopelson and Miller pledged their "beneficial interest" in the shares to Saxon.

The $1.5 million was transferred to Kopelson's personal CBC account. When the Banking Department authorized CBC to is-

sue 50,000 shares each to Kopelson and Miller, Kopelson delivered a personal check to CBC in the amount of $1.5 million. The transaction was approved by CBC's Board of Directors, and CBC took the funds into its capital account. No certificates were issued for the shares.

Eventually, BRNA encountered financial difficulties and filed a petition under Chapter 11 of the Bankruptcy Code. On January 10, 1984 the bankruptcy court converted BRNA's Chapter 11 reorganization to a Chapter 7 liquidation proceeding. BRNA's bankruptcy trustee, Curtis B. Danning (the "Trustee"), entered into an agreement with Saxon's probate estate and widow (Saxon had since died) entitled "Accord, Full Compromise and Final Settlement of Controversies" (the "Accord"), pursuant to which the parties stipulated to the allowance of the Trustee's asserted claims. Specifically, Saxon's estate stipulated the initial transfer from BRNA to Saxon was voidable under section[1] 548, which allows the trustee to "avoid" or set aside transfers if the debtor (1) made the transfer with actual intent to hinder, delay or defraud creditors, or (2) received less than equivalent value for the property and was insolvent when the transfer was made or became insolvent as a result of the transfer.

On August 18, 1985, the Trustee brought this adversary proceeding against Kopelson and Miller under section 550 to recover the $1.5 million transferred from BRNA to Saxon and from Saxon to Kopelson and Miller. The bankruptcy court entered summary judgment for the Trustee, and the district court affirmed. Kopelson and Miller filed timely notices of appeal. Kopelson's appeal was settled (he has agreed to pay $1 million to the Trustee) and was dismissed by this court on June 4, 1990.

## II

■■■■ A grant of summary judgment is reviewed de novo, *Isom v. United States*

Internal Revenue Service (In re Isom), 901 F.2d 744, 745 (9th Cir.1990), and this court "may base [its] ruling on any ground supported by the record." *Gilbert v. Ben–Asher*, 900 F.2d 1407, 1410 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 177, 112 L.Ed.2d 141 (1990) (citing *Jackson v. Southern Calif. Gas. Co.*, 881 F.2d 638, 643 (9th Cir.1989)). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Williams v. United States Gen. Servs. Admin.*, 905 F.2d 308, 310 (9th Cir.1990); *United States v. Daniel (In re R & T Roofing Structures & Commercial Framing)*, 887 F.2d 981, 984 (9th Cir.1989).

## III

The representative of a bankruptcy estate, generally a trustee, has broad powers under the Bankruptcy Code to "avoid" certain transfers of property made by the debtor either after or shortly before the filing of the bankruptcy petition. The property may be returned to the estate for the benefit of all persons who have valid claims against the debtor. In this case, the transfer from BRNA to Saxon was avoided under section 548.

Section 548(a)(2) allows the trustee to avoid a transfer if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and "was insolvent on the date that such transfer was made" or "became insolvent as a result of such transfer." Section 548(a)(1) permits the trustee to avoid any transfer made with "actual intent to hinder, delay or defraud any entity to which the debtor was or became ... indebted."

Section 550 authorizes the trustee to recover the transferred property.[2] Theo-

---

**1.** All section references are to the Bankruptcy Code of 1978, as amended (codified in 11 U.S. C.).

**2.** The theory under which a transfer has been avoided is irrelevant to the liability of the trans-

feree against whom the trustee seeks to recover. Section 550 provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548 ..., the trustee may recover, for the benefit of the estate, the property

retically, the trustee can recover from both the initial transferee and any secondary transferee, as well as from any entity for whose benefit the *initial* transfer was made. Section 550(b)(1), however, prohibits recovery from "immediate and mediate" transferees who take for value, in good faith, and without knowledge. The "good faith" defense of section 550(b) does *not* apply to the "initial transferee" of the debtor or the "entity for whose benefit such transfer was made," and the trustee's power to recover from these entities under section 550(a)(1) is absolute.

Both parties concede the initial transfer from BRNA to Saxon was avoidable under section 548. Saxon caused BRNA to transfer the $1.5 million to his personal account without any consideration whatsoever, and BRNA was insolvent or rendered insolvent by the transfer. Further, Miller concedes the initial transfer was made with actual intent to hinder or delay BRNA's creditors in violation of section 548(a)(1). These facts were stipulated in the Accord.

We are therefore faced with the narrow issue of whether Miller was a "transferee" of the $1.5 million within the meaning of section 550(a)(1) or section 550(a)(2). We hold he was not.

### IV

Section 550(a)(1) authorizes the trustee to recover from the "initial transferee" or "the entity for whose benefit such transfer was made." Both parties agree that Saxon was the "initial transferee." The Trustee, therefore, can rely on section 550(a)(1) only if Miller is an "entity for whose benefit such transfer was made."

■ The district court found "the money was deposited into Kopelson's account partially for defendant Miller's benefit." Relying on this finding, the district judge

concluded Miller was a transferee from whom the Trustee could recover. This conclusion is incorrect as a matter of law as Miller was not the "initial transferee," nor was the initial transfer made for his benefit.

This phraseology implies a requirement that, in transferring the avoided funds, the debtor must have been motivated by an intent to benefit the individual or entity from whom the trustee seeks to recover. It is not enough that an entity benefit from the transfer; the transfer must have been *made for his benefit.*

*Merrill v. Dietz (In re Universal Clearing House Co.),* 62 B.R. 118, 128 n. 12 (D. Utah 1986) (*"Universal Clearing House"*) (emphasis added). Indeed, courts have found that an entity need not actually benefit, so long as the transfer was *made* for his benefit. *See, e.g., In re Richmond Produce Co.,* 118 B.R. 753, 759 (Bankr.N.D. Cal.1990). In *Universal Clearing House,* the bankruptcy court held:

A reading of subsection (a)(1) in conjunction with the remainder of section 550 leads to the conclusion that the phrase "or the entity for whose benefit such transfer was made" refers to those who receive a benefit as a result of the initial transfer from the debtor—not as the result of a subsequent transfer.

Inequitable results would follow if one who benefits from a subsequent transfer is classified as a subsection (a)(1) transferee while one who actually receives a subsequent transfer is classified as a subsection (a)(2) transferee. Under such a classification an entity which actually *received* property from an initial transferee would be entitled to the protections of section 550(b) while one who did not actually receive the property but benefit-

transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.

ed in some way from the transfer would not be entitled to those same protections. *Universal Clearing House,* 62 B.R. at 128 n. 12 (emphasis in original).

■ A subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer. *Bonded Fin. Servs. v. European Am. Bank,* 838 F.2d 890, 895 (7th Cir.1988) (*"Bonded"*); *see also, In re Richmond Produce Co.,* 118 B.R. 753, 760 (Bankr.N.D.Cal.1990) (a subsequent transferee can *never* be an entity for whose benefit the initial transfer was made). The structure of the statute separates initial transferees and beneficiaries, on the one hand, from immediate or mediate transferees, on the other. The implication is that the entity for whose benefit the transfer was made is different from a transferee, immediate or otherwise. "Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language." *Bonded,* 838 F.2d at 896.

If, as the district court's opinion implies, Miller's transferee status rested on finding the transfer from Saxon to Kopelson was "partially for Miller's benefit," the grant of summary judgment was an erroneous interpretation of the relevant law. The initial transfer from BRNA *to Saxon* was not made for Miller's benefit, and entities who simply "benefit" from subsequent transfers are not subject to recovery by the Trustee. Miller was at most a subsequent transferee, and his liability must be analyzed under section 550(a)(2).

## V

■ The Trustee can also recover from any "immediate or mediate transferee" of the initial transferee who does not take in good faith, for value, and without knowledge. 11 U.S.C. §§ 550(a)(2), 550(b)(1) (1988). Miller claims he is not an immediate or mediate transferee of Saxon because no funds were ever transferred to him. The Trustee argues Miller was a joint transferee of the money deposited into Ko-

pelson's bank account, because Kopelson held the money jointly for Miller and Kopelson. Kopelson, claims the Trustee, had express instructions from Miller to use that money to purchase stock for Miller as well as for himself.

The Bankruptcy Code does not specifically define "transferee," and this circuit has never articulated a definition. The Seventh and Eleventh Circuits have addressed this issue in determining whether a particular entity is an "initial transferee" under section 550(a)(1). *Bonded,* 838 F.2d at 892–93; *Nordberg v. Societe Generale (In re Chase and Sanborn Corp.),* 848 F.2d 1196 (11th Cir.1988) (*"Chase & Sanborn"*).

In *Bonded,* a bank received a check, payable to the bank's order, with a note directing the bank to deposit the check into a customer's account. The funds were eventually used to pay off the outstanding balance on the customer's loan from the bank. The trustee claimed the bank was the initial transferee of the funds because it was the payee of the check. Judge Easterbrook, writing for the majority, held that the bank was not the initial transferee, but became a transferee *only* when the account was debited to pay off the loan.

> Although the Bankruptcy Code does not define "transferee", and there is no legislative history on the point, *we think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes.* When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded.

*Bonded,* 838 F.2d at 893 (emphasis added).

Similarly, the Eleventh Circuit in *Chase & Sanborn* attempted to arrive at a definition of "transferee" by referring to the "control test" used to determine whether a debtor is in "possession" of funds:

> The test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must "look beyond the particular transfers in question to the entire circumstance of the transactions."

The control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. This approach is consistent with the equitable concepts underlying bankruptcy law.... [T]he general approach ... applies regardless of whether a court is attempting to determine whether a debtor controlled the transferred funds it transferred to a defendant *or* a defendant gained control over the funds transferred to it. *Chase & Sanborn*, 848 F.2d at 1199 (citations omitted) (emphasis in original). The court went on to note it would be "inequitable" to allow recovery against an entity merely because it had "technically ... received the funds ...," if the entity had "never actually *controlled* the funds." *Id.* at 1200 (emphasis in original).[3]

We adopt the reasoning of Judge Easterbrook's opinion in *Bonded* and find that Miller was not a "transferee" within the meaning of section 550(a)(2). In *Bonded*, the bank was contractually obligated to follow the customer's instruction to deposit the funds into his account. *Bonded*, 838 F.2d at 891. Similarly, even though the funds transferred from Saxon to Kopelson were used partially to purchase stock in Miller's name, Miller was under a contractual duty to pledge the stock immediately to Saxon. Miller had no "dominion over the money," nor could he "put the money to [his] own purposes."

To paraphrase Judge Easterbrook, an entity does not have "dominion over the money" until it is, in essence, "free to invest the whole [amount] in lottery tickets or uranium stocks." *Bonded*, 838 F.2d at 894.

Just as the bank in *Bonded* did not become a transferee until the funds were used to pay down the loan, Miller would not become a transferee unless and until he gained the beneficial interest in the stock from Saxon.

Because the district court's finding that Miller was a "transferee" under section 550(a)(2) is an incorrect application of the relevant law, the district court's judgment is

REVERSED and the matter is REMANDED for proceedings consistent with this opinion.

---

3. Numerous bankruptcy courts have applied the "dominion" or "control" test. *See, e.g., In re Concord Senior Hous. Found.,* 94 B.R. 180 (Bankr.C.D.Cal.1988) (when fiduciary misappropriated funds for his own benefit, he became a "transferee"); *In re Auto–Pak, Inc.,* 73 B.R. 52 (D.D.C.1987) (debtor's president found to be transferee because he caused debtor's check to be converted to cashiers check and used money for his own benefit); *In re Jet Florida Sys.,* 69 B.R. 83 (Bankr.S.D.Fla.1987) (entity that received funds to facilitate the settlement of accounts among air carriers was not a transferee); *In re Bridges Enters.,* 62 B.R. 300 (Bankr.S.D. Ohio 1986) (attorney collecting settlement proceeds for a client is *not* a transferee); *In re Black and Geddes, Inc.,* 59 B.R. 873 (Bankr.S.D. N.Y.1986) (steamship agency that collected freight charges for common carrier and paid funds over to common carrier less a commission was not a transferee); *In re Jorges Carpet Mills,* 50 B.R. 84 (Bankr.E.D.Tenn.1985) (debtor's chief executive who paid a personal debt with debtor's funds is a transferee); *In re Fabric Buys of Jericho,* 33 B.R. 334 (Bankr.S.D.N.Y. 1983) (attorney collecting settlement proceeds for a client is *not* a transferee).