In re PRESIDENTIAL CORPORATION,
dba Presidential Homes, Debtor.

Michael McCARTY, Trustee, Appellant,

v.

RICHARD JAMES ENTERPRISES, INC.,
State of Washington, Department of
Revenue, Lancaster Homes, Inc., and
Seafirst Bank, Appellees.

BAP No. WW–94–2109–HCAs.
Bankruptcy No. 91–03264.
Adv. No. 94–00042.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Feb. 24, 1995.

Decided April 7, 1995.

234

Kenneth C. Weil, Seattle, WA, for appellant.

Glenn R. Nelson, Seattle, WA, for appellee Richard James Enterprises, Inc.

## *OPINION*

Before HAGAN, CASE,[1] and ASHLAND, Bankruptcy Judges.

HAGAN, Bankruptcy Judge:

Presidential Corporation ("debtor") is a debtor under chapter 7 of Title 11, United States Code. Michael McCarty ("trustee"), the bankruptcy trustee, filed suit against a number of parties to recover a fraudulent conveyance. The bankruptcy court granted a motion for summary judgment in favor of Richard James Enterprises, Inc. ("RJE"). The trustee appeals and RJE moves for sanctions for bringing the appeal. We AFFIRM the bankruptcy court's grant of summary judgment and DENY RJE's motion for sanctions.

### FACTS

This case involves a fraudulent conveyance to purchase property through escrow. There is no dispute regarding the facts.

Vatche Manoukian ("Manoukian") was the president, sole director, and sole shareholder of the debtor. On April 20, 1990, the debtor transferred $76,866.81 to Chicago Title as part of the purchase price for a personal residence for Manoukian. RJE was the listing agent for the seller in the transaction. This transfer was made without receiving reasonably equivalent value. At closing, Chicago Title disbursed a total of $256,440.05 to

---

**1.** Honorable Charles G. Case II, Bankruptcy Judge for the District of Arizona, sitting by desig- nation.

various parties, including $4,499.87 to RJE as its realtor's commission.

An involuntary Chapter 7 petition was filed against the debtor on May 3, 1991. Pursuant to a stipulation, the bankruptcy court entered an order for relief under Chapter 11 on August 21, 1991. The case was converted to Chapter 7 on January 15, 1992.

On or about January 3, 1994, the trustee filed an adversary proceeding against a number of parties[2] to recover the pro rata portion of the debtor's funds applied to the purchase of Manoukian's residence. This action was brought pursuant to 11 U.S.C. § 544(b) and Wash.Rev.Code Ann. 19.40.041(a)(2) (Washington Uniform Fraudulent Transfer Act). The trustee requested relief in the form of a judgment against RJE for $1,384, the pro rata portion of the debtor's funds transferred into escrow.

RJE filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure (made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure). The basis of RJE's motion was that the funds RJE received were a realtor's commission due and owing from the seller, that the transfer of the funds to RJE was made from the seller's proceeds at the close of escrow, that the seller was thus the initial transferee under 11 U.S.C. § 550(a)(1), and that RJE was therefore a subsequent transferee entitled to the defenses of 11 U.S.C. § 550(b)(1).

The trustee opposed the motion, contending RJE was the initial transferee because under the escrow arrangement it was the first party to have dominion over the funds.

After a hearing, the bankruptcy court held that RJE was not the initial transferee, and granted the motion for summary judgment. The order was entered on August 29. From this order the trustee timely appeals.

## ISSUE

Whether RJE was the initial transferee of the debtor's funds for the purposes of 11 U.S.C. § 550(a)(1).

## STANDARD OF REVIEW

■ A grant of a motion for summary judgment is reviewed de novo. *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 546 (9th Cir.1991). Construing the evidence in the light most favorable to the nonmoving party, the Panel must determine whether there are genuine issues of material fact and whether the lower court correctly applied the relevant law. *Id.*

## DISCUSSION

■ This action is based on section 19.40.041 of the Revised Code of Washington, which states in its pertinent part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

\* \* \* \* \* \*

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation....

Wash.Rev.Code Ann. § 19.40.041(a)(2) (West 1989). The trustee brings this action pursuant to section 544,[3] which provides:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b).

■ The trustee's ability to recover under section 544(b) is circumscribed by section 550. This section provides in part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, ... the trustee may recover, for the benefit of the

---

2. RJE was not named in the initial complaint, but was subsequently added under circumstances not relevant here.

3. Unless otherwise indicated, all references to "section" are to the respective section of Title 11, United States Code.

estate, the property transferred, or, if the court so orders, the value of such property, from-

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section

(a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; . . . .

11 U.S.C. § 550(a), (b)(1). Thus, both initial transferees and mediate or immediate transferees are liable to return a fraudulent transfer. However, subsequent transferees are provided a defense not available to an initial transferee; the subsequent transferee is insulated to the extent it took for value, in good faith, and without knowledge of the transfer's voidability. 11 U.S.C. § 550(b)(1). Initial transferees are subject to strict liability. *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir.1991).

Here, the trustee concedes that RJE is eligible for the defense of section 550(b)(1) *if* RJE is a subsequent transferee. The entirety of the trustee's case is based on the contention that RJE is the initial transferee, and therefore is strictly liable under section 550(a)(1).

### 1. *Definition of "Transferee."*

The definitive case in this circuit regarding the definition of "transferee" is *Bullion Reserve*, 922 F.2d at 544 *et seq.* In *Bullion Reserve*, Saxon, the president of the debtor, agreed to contribute $1.5 million to another corporation in exchange for an ownership interest. Miller and Kopelson, two directors of the other corporation, had the corporation issue 100,000 shares of stock to them "for Saxon's benefit." Saxon had the debtor transfer $1.5 million to his personal account. He then loaned Miller and Kopelson the $1.5 million, depositing the funds in Kopelson's account. The directors granted Saxon a security interest in the stock, and paid the funds over to the corporation. When the debtor filed bankruptcy, the trustee sued both directors to recovery the money as a fraudulent transfer. On appeal, the Ninth Circuit Court of Appeals considered whether Miller was a subsequent transferee under section 550(a)(2). ·

The court concluded Miller was not a transferee. The court adopted the so-called "dominion" or "control" test, as adopted by the Seventh Circuit in *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988).

> "Although the Bankruptcy Code does not define 'transferee', and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."

*Bullion Reserve*, 922 F.2d at 548 (emphasis deleted) (quoting *Bonded*, 838 F.2d at 893). "To paraphrase Judge Easterbrook, an entity does not have 'dominion over the money' until it is, in essence, 'free to invest the whole [amount] in lottery tickets or uranium stocks.'" *Bullion Reserve*, 922 F.2d at 549 (alteration in original) (quoting *Bonded*, 838 F.2d at 894). The Court of Appeals for the Ninth Circuit also suggested that courts should "'step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable.'" *Bullion Reserve*, 922 F.2d at 549 (quoting *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir.1988)).

The *Bonded* case also provides guidance. Ryan controlled a number of currency exchanges, one of which was Bonded, the debtor. Ryan borrowed $655,000 from a bank to finance his ownership of horses. Ryan had the debtor send the bank a check for $200,000 with a note directing the bank to deposit the funds into Ryan's account. Approximately one week later Ryan instructed the bank to debit his account $200,000; using the

funds to reduce the loan for his horses. The bank did so. Bonded filed bankruptcy, and the trustee sought to recover the transfer as fraudulent.

In finding that the Bank was not an initial transferee, the *Bonded* court stated in dicta that:

> If the note accompanying Bonded's check had said: "use this check to reduce Ryan's loan" instead of "deposit this check into [Ryan]'s account", § 550(a)(1) would provide a ready answer. The Bank would be the "initial transferee" and Ryan would be the "entity for whose benefit [the] transfer was made".

838 F.2d at 892 (alteration in original). The court then discussed the policy considerations behind the fraudulent transfer statute and the limitations on liability.

> The considerations behind the holder in due course rule for commercial paper, Uniform Commercial Code § 3–302, and the bona fide purchaser rule for chattels, UCC § 2–403(1)—the waste that would be created if people either had to inquire how their transferors obtained their property or to accept a risk that a commercial deal would be reversed for no reason they could perceive at the time—also apply to subsequent holders of assets fraudulently conveyed out of bankrupts. Just as the holder in due course rule requires the transferor of commercial paper to bear the risk and burden of inquiry, increasing the liquidity of paper, so § 550(b) leaves with the initial transferee the burden of inquiry and the risk if the conveyance is fraudulent. The initial transferee is the best monitor; subsequent transferees usually do not know where the assets came from and would be ineffectual monitors if they did.

838 F.2d at 892–93. When the bank received the check, it was required by law to treat the instructions that came with the check as a binding contract. 838 F.2d at 893. It was therefore not free to do anything other than to place the funds in Ryan's account. Ryan

was held to be the initial transferee. 838 F.2d at 893–94.

2. *Summary of the Trustee's Argument.*

The trustee contends RJE is the initial transferee on the following grounds. First, RJE was a transferee of the funds.[4] Second, until the funds were transferred to RJE, no party exercised unfettered dominion or control over the funds sufficient to be a transferee. Manoukian did not exercise dominion or control over the funds even though he had the debtor make the transfer, and the escrow agent did not have dominion or control over the funds because it was a mere conduit. Because RJE was the first party to exercise unfettered dominion or control over the funds, the trustee contends, it was the initial transferee. RJE contends the seller was the initial transferee.

■ Under Washington law, an instrument placed in escrow is beyond the "control or dominion" of the parties. *Bruener v. Hillman,* 186 Wash. 663, 59 P.2d 731, 734 (1936) (citing cases). Or, as the Supreme Court of Washington stated on a later occasion:

> Once deposited in escrow, an instrument passes beyond the control of the depositor, and he may not recall it.... Upon the performance of the condition named, the depositary must deliver it to the grantee. A deposit in escrow, therefore, amounts, by its terms, to a conditional delivery....

*Lechner v. Halling,* 35 Wash.2d 903, 216 P.2d 179, 185 (1950) (citations omitted). The trustee contends that this rule means no party had dominion or control sufficient to be a transferee so long as the property was in escrow. The funds did not pass through anyone else's hands before entering escrow, and did not leave escrow until the funds were transferred to RJE; therefore, RJE was the initial transferee of the funds.

■ The trustee's contentions carry some weight. However, we conclude that Manoukian was the initial transferee, based on the fact that the escrow agent received the funds from the debtor as agent for Manoukian. Manoukian as the principal had dominion or

---

**4.** RJE does not dispute that it was a "transferee" of the funds; it exercised dominion or control

over the funds once the funds were paid to it.

control even though he had contractually limited that dominion or control.

3. *A Principal Using an Agent to Apply Property to the Principal's Personal Benefit Has Dominion or Control Over the Property.*

 The escrow agent acts as an agent for each party to the escrow in separate capacities. Several Washington cases recognize that, where an escrow agent embezzles the money in escrow, the loss is borne by the party for whose benefit the agent was holding the funds at the time. *Lechner,* 216 P.2d at 183–84; *Angell v. Ingram,* 35 Wash.2d 582, 213 P.2d 944, 945 (1950). If the funds are embezzled prior to the closing of the escrow, the buyer must bear the loss. *See Angell,* 213 P.2d at 946. If the funds are embezzled after all the conditions have been met for closing, the seller must bear the loss. *Lechner,* 216 P.2d at 183–84. *See Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.),* 155 B.R. 332, 340 (Bankr. S.D.N.Y.1993) (once escrow closed, escrow agent held funds as agent of seller, and seller was therefore initial transferee).

 These cases demonstrate that the escrow agent's agency is not undifferentiated as between the parties to the escrow. Prior to the conditions being met for the funds to be transferred from the buyer to the seller, the escrow agent holds the funds as the agent of the buyer. In the present case, this means that at the time the debtor transferred its funds into escrow, the escrow agent held those funds as Manoukian's agent.

"A party may be deemed an initial transferee of funds, notwithstanding that he never actually took physical possession of those funds, if those funds were transferred to that party's agent." *Hooker Investments,* 155 B.R. at 340 (citing cases). *See also Bonded,* 838 F.2d at 893 ("When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."). This is so because the relationship between a principal and an agent necessarily implies that the principal controls the agent's actions.

"The agency relationship results if, but only if, there is an understanding between the parties which ... creates a fiduciary relation in which the fiduciary is *subject to the directions* of the one on whose account he acts. It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries and the agency agreement from other agreements."

*Zoda v. Eckert, Inc.,* 36 Wash.App. 292, 674 P.2d 195, 198 (1983) (emphasis in original) (quoting Restatement (Second) of Agency § 1, comment b (1958)).

Here, the escrow agent was a mere conduit through which Manoukian conducted a transaction for his own benefit. It is true that the funds paid into Manoukian's account by the debtor were beyond Manoukian's dominion and control in the sense that he could no longer change his mind as to their disposition; if the conditions of the escrow were satisfied, the funds would be transmitted in accordance with the agreement. The funds were *not* beyond Manoukian's dominion or control in another sense, however, because he was applying them for his personal benefit in accordance with his sole wishes. The funds were deposited in Manoukian's escrow account as though they were Manoukian's own funds; the property Manoukian received on the closing of escrow was not held for the benefit of another. Manoukian made the decision to buy the house, and applied the debtor's funds to that purpose.

 The ability to change one's mind regarding the disposition of property is evidence of dominion or control. The fact that a party may act to make his disposition of the property irrevocable, however, does not negate the fact that a disposition is pursuant to the principal's wishes and for the principal's benefit. Where a principal controls the disposition of funds through an agent, as Manoukian did here, the dominion or control test has been met.

4. *Extending Strict Liability to Parties Receiving Funds After the Funds Have Been "Washed" Through an Agent Is Both Inequitable and Against the Policy Underlying the Statute.*

The holding in *Bonded* supports the Panel's conclusion by analogy. The escrow

agent's receipt of the debtor's money on behalf of Manoukian is analogous to a deposit in a bank account. The bank receives the funds as an agent of the account holder, and the funds deposited in the account holder's bank account are subject to the dominion and control of that party. *Bonded,* 838 F.2d at 893–94. Similarly, the escrow agent here received the funds as an agent for Manoukian. A party who receives a subsequent transfer from the buyer's escrow account should not be required to investigate the source of the deposits, any more than a party receiving payment from someone's personal checking account should be required to investigate the source of the funds.

■■■ Any other conclusion would encourage parties to pass the risk of a fraudulent transfer downstream by using agents subject to irrevocable instructions. Such a result is inequitable, and against the policy that lies behind limited liability for subsequent transferees. *See Bonded,* 838 F.2d at 892–93. The inequity is clearly demonstrated in the present case. The purpose of any escrow agreement is for the buyer to buy the property, and the seller to sell the property. The payment of a realtor's commission on the transfer is wholly incidental to the purpose of the transfer. It would be inequitable, examining the transaction as a whole, to permit those parties best positioned to investigate the validity of a transfer to shift strict liability onto merely incidental beneficiaries of the escrow agreement. *See Bullion Reserve,* 922 F.2d at 549 (the court should " 'evaluate a transaction in its entirety to make sure that [its] conclusions are logical and equitable.' " (quoting *Nordberg v. Societe Generale (In re Chase & Sanborn, Inc.),* 848 F.2d 1196, 1199 (11th Cir.1988))).

*Hooker Investments,* 155 B.R. at 332 *et seq.,* also supports this conclusion. In *Hooker Investments,* the debtor entered into an escrow agreement with the seller of an option agreement. The original escrow agreement provided the seller would receive $500,000 that the debtor deposited into the escrow, and the seller alone would be liable to pay the broker its fee. After the money was

deposited into escrow, the parties amended the escrow agreement to provide that the $500,000 would not be transferred to the seller and credited against the purchase price. Instead, the escrow agent would pay the broker directly from the $500,000 in escrow, and the remainder would be returned to the debtor. After the debtor filed bankruptcy, it sued the broker to recover the broker's fee as a fraudulent conveyance. The court reviewed the law of escrow, and concluded (1) the transfer into escrow gave equitable title to the funds to the seller; (2) the transfer into escrow, and not the subsequent release of funds, constituted the relevant transfer; (3) once the escrow closed, the seller controlled the disposition of the funds; (4) because the funds remained with the escrow agent and were then transferred to the broker, the escrow agent was acting as agent for the seller; and thus (5) the seller was the initial transferee of the funds, 155 B.R. at 339–41.

The rationale of *Hooker Investments* essentially tracks our reasoning. The debtor in *Hooker Investments* was the purchaser through escrow; therefore the court did not need to examine the agency relationship between the escrow agent and the purchaser. The principles enunciated are basically the same, however.

■■■ The trustee attempts to distinguish *Hooker Investments* based on the fact the parties altered the escrow agreement after the funds were deposited in escrow. This, the trustee contends, indicates the seller exercised dominion or control. Since there were no changes to the escrow agreement here, the trustee argues, no dominion or control was exercised. However, *Hooker Investments* does not rely upon the fact the escrow agreement was changed to indicate the seller had dominion or control over the property. Moreover, the trustee's argument is unpersuasive, for the reasons discussed previously: where an agent holds property for the principal's sole benefit, the principal has dominion or control over the property, and the irrevocability of the principal's instructions to the agent are irrelevant.[5] The

5. We do not reach the issue of whether Manouki-

an became the initial transferee by "making" the

bankruptcy judge's grant of summary judgment to Richard James Enterprise is thus affirmed.

### 5. Sanctions Are Inappropriate In This Case.

RJE moves for sanctions against the trustee for bringing a frivolous appeal. Pursuant to BAP Local Rule 13, the Panel may award sanctions under Rule 38 of the Federal Rules of Appellate Procedure. *Franchise Tax Board v. Roberts (In re Roberts)*, 175 B.R. 339, 345 & n. 4 (9th Cir. BAP 1994). This rule permits an appellate court to award damages to the appellee if the appeal is frivolous. F.R.A.P. 38. "An appeal is frivolous when the result is obvious or the appellant's arguments are wholly without merit." *Am. Sav. Bank v. Harvey (In re Harvey)*, 172 B.R. 314, 319 (9th Cir. BAP 1994).

RJE's motion for sanctions is solely based on the existence of *Hooker Atlanta (7) Corp. v. Hocker (In re Hooker Investments, Inc.)*, 155 B.R. 332 (Bankr.S.D.N.Y.1993). RJE essentially contends the trustee's appeal was frivolous because the trustee contested *Hooker Investments'* reasoning.

While we decline to accept the trustee's arguments, this appeal was not frivolous. *Hooker Investments* is not binding precedent in this circuit. The result of this appeal was not obvious, nor were the trustee's arguments "wholly without merit." Nor is there any indication the trustee brought this appeal for an improper purpose; the record indicates the trustee has consistently acted professionally. RJE's motion for sanctions is itself frivolous, and it is denied.

---

debtor transfer the funds into escrow, thus establishing dominion or control over the funds. The case of *Richardson v. FDIC (In re M. Blackburn Mitchell Inc.)*, 164 B.R. 117 (Bankr.N.D.Cal. 1994), raises questions regarding whether a party should be held to be the initial transferee under those circumstances. It is unnecessary for us to resolve this issue here, and we decline to do so.