In re VIDEO DEPOT, LTD., Debtor.

Kenneth R. SCHAFER, Trustee in bankruptcy for Video Depot, Ltd., Plaintiff,

v.

LAS VEGAS HILTON, Defendant.

Bankruptcy No. 90–06278.
Adv. No. A92–08565.

United States Bankruptcy Court,
W.D. Washington.

Aug. 29, 1995.

James Day, Bush Strout & Kornfeld, Seattle, WA, for plaintiff.

Scott M. Mahoney, Las Vegas, NV, for defendant.

### MEMORANDUM OPINION

SAMUEL J. STEINER, Bankruptcy Judge.

#### FACTS

Prior to filing, the debtor sold consumer electronic goods, at both retail and wholesale. Jeffrey Arlynn was the debtor's sole officer, director, and shareholder. Arlynn was an active gambler with lines of credit at various Las Vegas casinos, including defendant, the Las Vegas Hilton.

Arlynn made approximately sixty trips to the Hilton between 1985 and 1990, often on a weekly basis. The Hilton valued Arlynn's patronage and furnished transportation to him from time to time. Scott Stoner, an executive host of the Hilton whose role it is

to attend to the needs of "high rollers", extended his services and friendship to Arlynn.

Between 1985 and 1987, the Hilton extended credit to Arlynn primarily on the basis of "this trip only" (referred to as a "TTO"). That is, the amount advanced was reviewed each time he requested credit. After 1987, Arlynn was given a permanent credit line of $50,000. In conjunction with granting Arlynn the line, the Hilton performed an investigation of his finances. As part of the investigation, the Hilton discovered that Arlynn's bank rating was a "low six", indicating an average balance between $100,000 and $300,-000. The Hilton also reviewed information from a central credit reporting agency. In addition, Mr. Stoner visited Arlynn in Bellingham, Washington, and observed his home, place of business, and general lifestyle.

In February, 1990, the Hilton increased Arlynn's credit limit to $75,000 plus TTOs, without updating its credit information. Up to that time, Arlynn's balance had twice exceeded $100,000, the highest being $121,000 in July of 1988. Until May and June of 1990, Arlynn always paid his account in full at the end of each trip or the beginning of the next. The record shows that Arlynn gambled on February 3 and February 10, 1990. On both occasions, his balance peaked at $81,000 and as usual was promptly reduced to zero. The next activity was on May 5 and May 9, at which point Arlynn's balance reached $225,-000.

On June 15, 1990, the debtor issued its check for $65,000 to U.S. Bank. The check bears the signatures of Arlynn and another individual, and contains a notation that it was for the purchase of a cashier's check to the Las Vegas Hilton. On June 16, 1990, the bank issued a cashier's check for $65,000, payable to the Hilton. The cashier's check identifies the purchaser as "VIDEO DEPOT LTD". On the same day, Arlynn gave the Hilton the $65,000 cashier's check, along with a second cashier's check for $10,000 showing Arlynn as the remitter. Arlynn deposited this $75,000 with the Hilton and then gambled against it, exhausting the deposit.

When asked whether the Hilton had asked Arlynn for a cashier's check, Mr. Stoner responded that he and Arlynn were friends and that he had not made such a request. He noted, however, that Arlynn "just knew" that someone owing money would have to bring in a cashier's check or cash if he wanted to play.

As previously indicated, Arlynn's balance in May and June, 1990, was the highest it had ever been. It was the first time he did not reduce his balance to zero, and it was the only time he paid by cashier's check. The rest of his payments were made with chips, cash, or check. During this period Arlynn held an active credit line at other casinos. The Hilton acknowledges having been aware of only one, notwithstanding the fact that Las Vegas casinos have a central credit reporting agency to which they subscribe.

The record shows that the Hilton has between seven hundred fifty to one thousand customers with credit lines over $100,000, and some with lines over $5 million. Thus the size of Arlynn's credit line appears not to be extraordinary for the Hilton.

It is not uncommon for casino customers to pay by cashier's check. It is the Hilton's policy to verify cashier's checks to ensure no stops or holds have been imposed and that they have not been altered, forged, or stolen. In Arlynn's case, no calls were made to the bank because of his history with the casino. Had the Hilton checked, however, its investigation would have would been limited to whatever was necessary to determine that the check was good.

It is also not unusual for casino customers to pay with checks drawn on business accounts. Arlynn had used Video Depot checks from time to time, and he also wrote at least one check on an account identified as "Jeffrey Arlynn Business Account". The Hilton does not inquire into the source of its customers' payments, except to the extent necessary to ensure the funds are good. According to the testimony, the Hilton accommodates its customers' desire for secrecy by not inquiring into their affairs and by offering a special account, so that customers may write checks without the Hilton appearing as payee.

At no time did the debtor owe the Hilton any money. The debtor received no consideration from the Hilton in exchange for the cashier's check. The debtor was insolvent to the extent of $2 million at the time the Hilton negotiated the cashier's check.

After the Video Depot bankruptcy was filed, the Hilton ran a credit check on Arlynn and found that his personal credit was satisfactory. At no time, however, did the Hilton investigate the debtor's finances.

## PROCEDURE AND ISSUES

The trustee sued the Hilton, contending that the $65,000 payment was fraudulent under 11 U.S.C. Sec. 548(a), and that the Hilton was liable under Sec. 550. The Hilton answered that the payment to it was not fraudulent under Sec. 548, because it constituted a loan from the debtor to Arlynn, which loan Arlynn repaid. Alternatively, the Hilton asserted that it is not liable as initial transferee under Sec. 550(a)(1), and that as subsequent transferee under Sec. 550(a)(2), it is protected by Sec. 550(b)(1) as a good faith transferee without knowledge of the voidability of the transfer.

The trustee filed a motion for summary judgment. The Court ruled that there was inadequate evidence of a loan from the debtor to Arlynn, and hence the transfer was constructively fraudulent under Sec. 548. As to the Hilton's liability, the Court held that the Hilton had inquiry knowledge of the voidability of the transfer and hence did not have available to it the defense of Sec. 550(b)(1). Hence the Court did not need to reach the issue whether the Hilton was the initial transferee or a subsequent transferee. The Hilton appealed the summary judgment, and in an unpublished opinion the Bankruptcy Appellate Panel reversed, holding that the defendant had established genuine issues of material fact under both Sec. 548 and Sec. 550.

Just prior to trial, the Hilton moved for summary judgment on the Sec. 550 issues, conceding that the transfer was fraudulent.[1] This Court granted summary judgment in favor of the Hilton on the initial transferee issue, and the matter proceeded to trial on the issue of the Hilton's Sec. 550(b) defense. The Court took the matter under advisement, and in the course of deliberations, reconsidered its ruling on the initial transferee determination.

The issues to be addressed here are 1) whether the Hilton is liable as initial transferee under Sec. 550(a)(1), and 2) if not, whether as subsequent transferee, the Hilton took the transfer for value, in good faith, and without knowledge of the voidability of the transfer for purposes of Sec. 550(b).

## DISCUSSION

The Trustee seeks to recover the payment made to the Hilton on the basis of Section 550, which provides in pertinent part as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under subsection (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt in good faith, and without knowledge of the voidability of the transfer avoided....

The trustee's power to avoid a fraudulent transfer under Sec. 548 preserves the Bankruptcy Code's policy of ensuring a rata-

---

1. In its motion for summary judgment the Hilton stated it was conceding the fraudulent conveyance issue for purposes of the motion only. However, the Hilton also conceded the issue in the pretrial order, and never introduced evidence on the issue. When the Court later reconsidered its decision on the initial transferee issue, it offered to reopen the testimony. Neither side accepted the Court's offer. Hence the Hilton clearly conceded that the conveyance was fraudulent for all purposes.

ble distribution of assets to creditors of the estate. Section 550(a) supports this policy by imposing liability on three potential entities, namely the initial transferee, the entity for whose benefit the transfer was made, and subsequent transferees. As to the first two, liability is absolute. Subsequent transferees, on the other hand, are not liable if they took for value, in good faith, and without knowledge of the voidability of the transfer. These provisions reflect the decision of Congress to favor legitimate creditors of the estate over those who have no claim to the debtor's assets, but who have nevertheless received the benefit of them. While such a transferee may well be innocent, so are the creditors.

> [T]he unwinding of the situation by requiring the return of the money to the Trustee takes away from no one anything to which that person is entitled. Holding that the Trustee may recover simply places all the parties in the position where they were before the wrongful transfer took place. Sec. 550 puts the parties in the same position they occupied before the fraudulent transfer occurred.

*In re Nordic Village, Inc.*, 915 F.2d 1049, 1056 (6th Cir.1990), *rev'd on other grounds* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992.)

Balanced against these bankruptcy considerations is the need to observe certain commercial conventions. The same policy considerations behind the holder in due course and bona fide purchaser doctrines are preserved by Sec. 550(b), which provides subsequent transferees with a defense. This places the burden of inquiry and risk on the initial transferee, who is in a better position to monitor the debtor. *In re Presidential Corp.*, 180 B.R. 233 (9th Cir. BAP 1995).

■ *Initial Transferee.* The policy and structure of Sec. 550(a) are uncomplicated and straightforward. However, problems arise when, in a given situation, the court deems it more equitable to favor the recipient of the transfer over creditors of the estate. *In re M. Blackburn Mitchell, Inc.*,

164 B.R. 117, 123 (Bankr.N.D.Cal.1994). To protect itself from strict liability, the Hilton contends that it was not the initial transferee. Rather, it asserts that the initial transferee was Arlynn, and that the debtor's payment of Arlynn's debt in reality constituted a loan or transfer to Arlynn. In support of its position, the Hilton directed the Court's attention to Arlynn's affidavit and a portion of the debtor's ledger, which reflects payments to and from Arlynn during the period surrounding this transaction. The Hilton offered these documents in response to the trustee's motion for summary judgment, on the fraudulent conveyance issue. The Hilton did not offer the ledger at trial, nor did it proffer any testimony relating to the debtor's accounts. There being no evidence before the Court to support the Hilton's contention that Arlynn reimbursed the debtor for the transfer, this argument fails.

Alternatively, the Hilton contends that where a principal directs the transfer of a debtor's funds to satisfy a personal obligation, the principal is the initial transferee as a matter of law. This theory has received support in cases from other bankruptcy courts. *See In re Jorges Carpet Mills*, 50 B.R. 84 (Bankr.E.D.Tenn.1985); *In re Auto–Pak, Inc.*, 73 B.R. 52 (D.D.C.1987); *In re Concord Senior Housing Foundation*, 94 B.R. 180 (Bankr.C.D.Cal.1988). No appellate court has so held, although the suggestion has appeared in *dicta*. *See In re Nordic Village, Inc.*, 915 F.2d 1049 (6th Cir.1990). In *M. Blackburn Mitchell Inc., Supra*, the Bankruptcy Court for the Northern District of California flatly rejected this approach as a result-oriented manipulation of the Code. In *Presidential, Supra*, the Bankruptcy Appellate Panel expressly declined to decide the issue, noting that the *Mitchell* case "raises questions regarding whether a [principal] should be held to be the initial transferee under those circumstances." *Id.* at 239, n. 5.

■ The theory stems from an unwillingness of some courts to hold transferees strictly liable in cases where they lacked knowledge of the source of the funds they received.[2] *Auto–Pak, Supra*, at 54 ("The

---

2. This is not the case here, since the cashier's check payable to the Hilton identified the pur-

chaser as Video Depot.

IRS had no way of knowing that the funds supporting the cashier's check had been drawn on [the debtor's] account."). Knowledge and good faith are irrelevant to the liability of an initial transferee. *In re Bullion Reserve of North America*, 922 F.2d 544 (9th Cir.1991). Thus courts have obtained the desired result by manipulating the definition of initial transferee enunciated by the Seventh Circuit in *Bonded Financial Services, Inc., v. European American Bank*, 838 F.2d 890 (7th Cir.1988), and by the Eleventh Circuit in *Nordberg v. Societe Generale (Chase & Sanborn Corporation )*, 848 F.2d 1196 (11th Cir.1988).

In *Bonded*, the defendant bank had received the debtor's check and deposited it in the account of debtor's principal, pursuant to the debtor's instructions. Shortly thereafter, the principal applied the funds to his personal loan with the bank. The trustee attempted to recover from the bank as initial transferee of a fraudulent transfer. The Court held that until the principal directed the bank to debit the account to reduce his loan, the bank was not a transferee at all but merely a financial intermediary or conduit for the funds. Rather, the principal, who had received the funds for his own account, was the initial transferee. In so ruling, the Court stated:

> [T]he minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the "initial transferee"; the agent may be disregarded.

*Id.* at 893.

The Ninth Circuit adopted the *Bonded* test in *Bullion Reserve, Supra.* The *Bullion Reserve* Court also approved the Eleventh Circuit's parallel ruling *Societe Generale.* There the Eleventh Circuit employed a control test to hold that a depository bank was merely a conduit and hence not a transferee. This test as to whether an entity meets the minimum requirement of transferee status has since been referred to as the "dominion and control test" or the "conduit theory." *Nordberg v. Arab Banking Corp.*

(*In re Chase & Sanborn Corp.*), 904 F.2d 588, 598 (11th Cir.1990).

The defendant contends that, under this theory, Arlynn was the initial transferee because he had dominion and control over its funds, as its principal. Thus when Arlynn made the decision to purchase a cashier's check with the debtor's funds and designate the Hilton as payee, he exercised control over the funds and used them for his own purposes. This result is not supported by *Bonded* or *Societe Generale*, the focus of which was to protect agents whose status as transferee was purely technical.

First, the dominion and control test must be applied to the control exercised by the alleged initial transferee over the funds, not to the control exercised by a principal over the debtor. *Arab Banking*, 904 F.2d at 597. In *Arab Banking*, a bankruptcy court had applied the control test of *Societe Generale* to identify the debtor's principal as initial transferee in a case factually identical to the case at bar. The Eleventh Circuit explained that the bankruptcy court had misinterpreted of its prior ruling in *Societe Generale*, stating:

> [T]he extent of [the principal's] control over Chase & Sanborn generally, and over Chase & Sanborn's actions in transferring the disputed funds to ABC in particular, is entirely irrelevant to the "initial transferee" issue. The relevant issue is ABC's control over the funds, vis-a-vis [the principal], Chase & Sanborn, or anyone else, when they arrived at ABC [Citation omitted].

*Id.* at 598.

Second, the minimum level of control necessary to qualify as initial transferee is the *right* to put the money to one's own purpose. The transferee must have received something from the transferor that it can "call its own" *Bonded*, at 893; to be able to "invest the whole [amount] ... in lottery tickets or uranium stocks." *Id.* at 894. The Hilton contends that as principal of the debtor, Arlynn's appropriation of the debtor's funds to his own use qualifies him as initial transferee, even though his doing so may have been improper. In *Nordic Village, Su-*

pra, the Court suggests in *dicta* that a principal taking a corporate check to pay personal debts may be deemed the initial transferee, if the principal is viewed as having taken the funds illegally. *Id.* at 1055. On the other hand, if the principal is viewed as acting for the debtor, then the principal is not the initial transferee. *Id.*

■ As a factual matter, there has been no contention that Arlynn's conduct in this case was illegal. Rather, he acted for the debtor in directing a fraudulent transfer. As a purely legal issue, a right to direct the use of funds is not sufficient. In *Mitchell,* the Court added that actual *"receipt* of a debtor's property is an essential element in the definition of 'initial transferee.' Without *receipt and the right* to put the property to his or her own use, a principal is not liable as an initial transferee under § 550(a)(1)." *Mitchell* at 125 (emphasis added).

■ Third, the parties' roles in the transaction must be ascertained vis-a-vis one another, with reference to the statute as a whole. Sec. 550(a) confers liability not only on transferees but on the entity for whose benefit the transfer was made.

The structure of the statute separates initial transferees and beneficiaries, on the one hand, from "immediate or mediate transferee[s]", on the other. The implication is that the "entity for whose benefit" is different from a transferee, "immediate" or otherwise. *The paradigm "entity for whose benefit such transfer was made" is a guarantor or debtor—someone who receives the benefit but not the money....*

*Bonded,* 838 F.2d at 895 (emphasis added).

Mindful of this structure, the *Bonded* Court distinguishes between a one-step transaction in which the debtor's check is paid directly to its principal's creditor, and a two-step transaction in which the debtor's check is paid to the principal, who then pays his own creditor. In the first case, the creditor is the initial transferee, and the principal is the entity for whose benefit the transfer was made. In the second case, the principal is the initial transferee, and the creditor is the subsequent transferee. To clarify, the Court offered the following example:

If Bonded had sent a check to the Bank with instructions to reduce Ryan's loan, the Bank would have been the initial transferee and Ryan the "entity for whose benefit." (Citations omitted.) Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated.

*Id.* at 895, 896. In *Societe Generale,* 848 F.2d at 1199, the Court suggested that courts should "step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable." *See also Bullion Reserve.*

Counting the steps in a transaction helps in such an evaluation. It serves to distinguishes *In re Dietz,* 94 B.R. 637 (Bankr.9th Cir.1988), on which the Hilton relies to support its position. In *Dietz,* the debtor had operated two businesses, Com–Group and Airbrush Digest. A trustee ultimately assumed the operation of Com–Group but chose not to operate Airbrush Digest. Without the knowledge of the trustee or authorization from the Court, the debtor continued to operate Airbrush Digest himself. He established a bank account, into which he deposited funds of the debtor, and paid Airbrush creditors from it. The trustee contended that the debtor was a "mere conduit", and that no transfer had occurred until creditors had been paid. The Court rejected this argument as a misapplication of the conduit theory, noting that the initial transfer occurred when the debtor took the funds. The Court stated that the debtor would have been a conduit if the transfer to it was solely for the purpose of benefitting the eventual transferees. However, in this case the debtor had converted estate funds to continue the operation of Airbrush. No distinction was made between the debtor and Airbrush, presumably because Airbrush was a proprietorship of the debtor and not a separate entity.

*Dietz* adds nothing to the Hilton's case. It involved a two-step transaction, from the es-

tate to the account of the debtor and/or Airbrush, and from that account to the creditors of the debtor and/or Airbrush. Clearly the debtor and Airbrush were not conduits, because the debtor had full control over the funds.

■ According to the Hilton, *Dietz* stands for the proposition that "misappropriating funds is itself a transfer which makes the misappropriating person the initial transferee before such person ever puts the funds in the hands of a third party such as Hilton." Memorandum in Support of Summary Judgment at 8, 9. This distorts the case. Rather, *Dietz* supports the conclusion that a principal who causes the debtor's funds to be deposited into his own account is an initial transferee, not because he directed the transfer, but because the funds went into his account.

Thus it appears that the rule that the Hilton would have this Court adopt was conceived out of a reluctance to apply strict liability, e.g. *Jorges*, and has been perpetuated by a legal fiction and a misapplication of the conduit rule of *Bonded* and *Societe Generale*. *Arab Banking* broke the trend in the Eleventh Circuit, and the indications are that the Ninth Circuit (or at least the BAP), will follow suit. *Presidential*, 180 B.R. 233.

In *Presidential*, the debtor transferred funds to an escrow account as part of the purchase price for a personal residence for its principal. At closing the escrow account was disbursed to various parties, including the defendant real estate agent in payment of its commission. The trustee sued the real estate agent and other recipients, alleging that they were initial transferees of the fraudulent transfer of the debtor's funds. The Court held that the debtor's principal, not the real estate agent, was the initial transferee, "based on the fact that the escrow agent received the funds from the debtor as agent for [the principal]." *Id.* at 237.

Applying the conduit test, the Court looked to Washington law to determine that an escrow account is the agent of the buyer until the sale has closed. The Court analogyzed the escrow account to a bank account belonging to the debtor's principal and treated it as a conduit. This was thus a two-step transaction. The fact that the account had a limited purpose, thus limiting in a sense the principal's dominion and control over the funds, did not detract from the analysis.

The ability to change one's mind regarding the disposition of property is evidence of dominion or control. The fact that a party may act to make his disposition of the property irrevocable, however, does not negate the fact that a disposition if pursuant to the principal's wishes and for the principal's benefit. Where a principal controls the disposition of funds *through an agent*, ... the dominion or control test has been met.

*Id.* at 238. (Emphasis added).

In a footnote, the Court expressly stated that it was not deciding the issue presented by this case:

We do not reach the issue of whether [the principal] became the initial transferee by "making" the debtor transfer the funds into escrow, thus establishing dominion and control over the funds. The case of *Richardson v. FDIC (In re M. Blackburn Mitchell Inc.)*, 164 B.R. 117 (Bankr. N.D.Cal.1994), raises questions regarding whether a party should be held to be the initial transferee under those circumstances. It is unnecessary for us to resolve this issue here, and we decline to do so.

*Id.* at 239, n. 5.

Applying the dominion and control principle, as refined by *Arab Banking* and *Mitchell*, the Hilton clearly received the debtor's funds and acquired the immediate right to put the money to its own use. Arlynn may have had the right, as debtor's principal, to the direct the use of its funds. However, he never actually received the funds. Under the test, he is not the initial transferee, but rather the entity for whose benefit the transfer was made. Both Hilton and Arlynn are strictly liable for the return of those funds under Sec. 550(a)(1).

■ *Subsequent Transferee.* If the Hilton were not the initial transferee but rather a subsequent transferee, then it would not have available to it the defense of Section

550(b). Sec. 550(b) provides a defense for a subsequent purchaser that takes "for value, including satisfaction or securing of a present or antecedent debt in good faith, and without knowledge of the voidability of the transfer avoided." There is no issue here concerning value. The only issue is whether the Hilton knew or "possessed enough knowledge of the events to induce a reasonable person to investigate." *Bonded,* 838 F.2d at 897, 898.

This Court ruled before trial that the burden of proving the elements of Sec. 550(b) falls on the transferee as a defense. *In re Data Lease Financial Corp.,* 176 B.R. 285 (Bankr.S.D.Fla.1994). The cases provide some but little guidance as to what constitutes sufficient knowledge to evidence a lack of good faith. The BAP directed the Court to *Bonded,* in which the Court stated:

> No one supposes that "knowledge of voidability" means complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do. (Citations omitted.) Some facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge. (Citation omitted). But this is not the same as a duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain. "Knowledge" is a stronger term than "notice", (citation omitted). A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own.

*Id.* at 898.

When the matter initially came before this Court on the trustee's motion for summary judgment, the Court held that the Hilton was placed on inquiry notice by the payment of Arlynn's personal debt by a corporate check, citing *Nordic Village, Supra.* The BAP disagreed, ruling that this knowledge of the source of funds was insufficient in and of itself to prompt an investigation. Additionally, the BAP ruled that if the Court found after trial that the Hilton had sufficient knowledge to compel an inquiry, the trustee would then be required to establish that an investigation would have revealed the voidability of the payment, citing *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988), and *Lippi v. City Bank,* 955 F.2d 599 (9th Cir.1992).

After hearing the facts, the Court concludes that Arlynn's conduct, in conjunction with the cashier's check purchased by Video Depot, was sufficient to give the Hilton actual knowledge of the very real potential that Arlynn's business was troubled and that the check was potentially voidable.

Arlynn was an active gambler from the start of his relationship with the Hilton. He was also consistent in the size of his wagers and pattern of payment. His behavior in June of 1990 was radically different from what had preceded. His pattern had been to gamble within his credit line plus TTOs during the visit and then pay in full at the beginning of his next visit. His limit had been $50,000, increasing to $75,000 in February, 1990. With the addition of TTOs, his balance had reached $100,000 only twice, and had never exceeded $121,000. In May, 1990, he started gambling with a zero balance and within a few days owed $225,000. He then left without paying. On his return, he deposited the $75,000 with the Hilton but made no payment on the account.

The $75,000 consisted of two cashier's checks, one for $10,000 purchased by Arlynn, and the other for $65,000 purchased by the Video Depot. This mode of payment did not pass unnoticed by the Hilton, since Arlynn told Mr. Stoner that he was going to bring in a cashier's check in order to gamble. This was necessitated by the Hilton's policies, of which Arlynn was aware. It signalled an escalation in his gambling without an equivalent ability to manage the debt.

The Hilton recognizes the desire of its customers to hide their gambling from society and others, and it actively assists in this regard. It relies on what is for some a compulsive activity to support its own profits. To the extent necessary to maintain the patronage of its clientele, the Hilton indulges its customers and directs its own efforts to shield them from whatever social and/or economic consequences they want to avoid. The Court infers that the Hilton was cognizant of its own risks and indifferent to the source of

payment. *See Kupetz v. Wolf,* 845 F.2d at 848 ("Willed indifference" is not a defense).

 That the payment of gambling debts with corporate checks is commonplace should not constitute a defense for a casino. This is not to urge adoption of a general rule that any entity receiving a corporate check for payment of a personal debt is imputed with knowledge of voidability. Certainly many expenses are arguably proper business expenses, and a transferee would have no reason to suspect otherwise. It is a different matter, however, where a sophisticated transferee routinely accepts business checks for debts which it knows are exclusively personal, in order to assist its customers in concealing the nature of the expenditure.

The Hilton was not oblivious to Arlynn. They knew him, and they knew his gambling and payment patterns. His conduct in June of 1990 was extraordinary, and they were cognizant of that as well. These facts strongly suggest a possibility that Arlynn and the business he ran were suffering financially. Further, the Hilton knew that it was being paid by way of a business check for a debt that was under no circumstances a proper business expenditure. Knowledge of these facts is sufficient to attribute the Hilton with knowledge of the voidability of the transfer. If it chose to be indifferent to the facts, it did so at its own risk, and not at the risk of the legitimate creditors of the estate.

## *CONCLUSION*

Based on the foregoing, the Court concludes that judgment should be entered in favor of the trustee in the sum of $65,000, plus costs.