FILED

NOV 02 2017

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

### UNITED STATES BANKRUPTCY APPELLATE PANEL
### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP Nos.  WW-17-1006-BKuF |
| | WW-17-1007-BKuF |
| CASCADE AG SERVICES, INC., | (Cross-Appeals) |
| Debtor. | Bk. No.  12-18366-MLB |
| | Adv. No.  15-01060-MLB |
| VIRGINIA A. BURDETTE, Chapter 7 Trustee, | |
| Appellant/Cross-Appellee, | |
| v. | **M E M O R A N D U M**[1] |
| EMERALD PARTNERS, LLC, a Washington Limited Liability Company; MELANIE S. BRUCH, as Trustee for the Melanie Bruch Living Trust; CHRISTOPHER H. SHEAFE; R. KEITH STOREY, as Trustee of the Storey Family Living Trust; NANCY C. STOREY, as Trustee of the Storey Family Living Trust, | |
| Appellees/Cross-Appellants. | |

Argued and Submitted on September 28, 2017,
at Seattle, Washington

Filed - November 2, 2017

Appeal from the United States Bankruptcy Court
for the Western District of Washington

Honorable Marc L. Barreca, Bankruptcy Judge, Presiding

Appearances:   Kevin Arnold Bay of Tousley Brian Stephens PLLC

---

[1]  This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

argued for appellant/cross-appellee; Danial D. Pharris of Lasher, Holzapfel, Sperry & Ebberson argued for appellees/cross-appellants.

---

Before:   BRAND, KURTZ and FARIS, Bankruptcy Judges.

Chapter 7[2] trustee Virginia A. Burdette ("Trustee") appeals a judgment against Emerald Partners, LLC, Melanie S. Bruch, Christopher H. Sheafe, R. Keith Storey and Nancy C. Storey (collectively "Haller Farms"), ruling that the debtor's transfer of 2/3 of its 2011 blueberry crop proceeds to Sakuma Brothers Farms, Inc. ("Sakuma") was an avoidable fraudulent transfer under both federal and state law and awarding Trustee $40,438 against Haller Farms — the intended beneficiary of that transfer.  Trustee maintains that the avoidable fraudulent transfer by the debtor was the $395,159 it expended for growing blueberries for the 2011 growing season without payment from Haller Farms.

Haller Farms cross-appeals the court's ruling that it was the intended beneficiary of, and did benefit from, the debtor's contract with Sakuma to manage and control the blueberry operation in 2011 and the debtor's transfer of the 2/3 portion of the blueberry crop proceeds to Sakuma, which ultimately reduced the debt Haller Farms owed to Sakuma by $40,438.

We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Background of the parties and their relationship

Cascade Ag Services, Inc. ("Debtor") is the surviving

---

[2]  Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-2-

corporation of four entities which were merged approximately two weeks before Debtor's chapter 11 bankruptcy filing on August 13, 2012. The four predecessor entities were (1) Cascade Ag Services, Inc. ("Cascade Ag"), (2) Staffanson Harvesting, LLC, (3) Mountain View Produce, Inc., and (4) Sterling Investment Group, LLC. One or more of Debtor's predecessor entities was wholly or partially owned by Craig Staffanson, an experienced farmer.[3] Prior to the bankruptcy filing, Cascade Ag did business under the trade name "Pleasant Valley Farms." Its primary business was the growing and processing of cucumbers and cabbage into pickles and sauerkraut and selling its food products. Debtor's case was converted to chapter 7 on August 8, 2014.

The members of Haller Farms are tenants in common owners of agricultural land in Skagit County, Washington, which is leased to farmers.[4] Haller Farms has never been in the agricultural business as either growers or processors.

Cascade Ag and Staffanson Harvesting leased land from Haller Farms for its operations. The only formal business or legal relationship Debtor's predecessor entities had with Haller Farms was as lessees of its land. Other than Mr. Staffanson attending the Haller family's annual meetings to discuss generally the status of the entities' various farming operations, Haller Farms

---

[3] Going forward, all references to "Debtor" include Cascade Ag Services, Inc. (as merged) and any of Debtor's predecessor entities.

[4] The individual members of Haller Farms are absentee owners of the land, residing in Washington, California and Arizona. They are the descendants of Granville and Henrietta Haller. The Haller family has continuously owned the land since the 1800s.

-3-

was not provided with ongoing farming updates or financial information concerning Debtor's predecessor entities.

**B.    The Blueberry Field:  2002 through 2010 and 2012 through 2015**

In 2002, Staffanson Farms, Inc., a non-debtor entity that was co-owned by Mr. Staffanson, leased approximately 108 acres of land from Haller Farms and planted blueberry plants (the "Blueberry Field").  The blueberry plants, planting and related installation costs totaled $434,158, owed to Oregon Blueberry Farms & Nursery. By the end of 2003, Staffanson Farms could not pay for the plants or field improvements and went out of business.  Haller Farms entered into an agreement with Oregon Blueberry that the $434,158 could be paid on a non-recourse basis from the net profit of each year's crop (to be farmed by others) but only after payment of all costs of maintaining the field and producing the harvest.  At all times relevant to this lawsuit, Haller Farms owned the blueberry plants and the land on which they were planted.[5]

Around 2004-2005,[6] Sakuma, a berry grower and processor owned by Steve Sakuma, began managing the Blueberry Field and farming blueberries.  Sakuma entered into an agreement with Haller Farms to advance all costs of management, maintenance, and further establishment and improvement of the Blueberry Field in exchange for the right to purchase the fruit from each year's harvest. Sakuma agreed to pay market prices for the fruit from each harvest

---

[5]  Staffanson Harvesting's 2009 lease with Haller Farms was revised to reflect that Haller Farms owned both the blueberry plants and the land on which they were planted.

[6]  From 2003-2004, a company called Delta Breeze, Inc. managed the Blueberry Field and farmed blueberries.  It then decided to terminate its involvement.

-4-

at the prices Sakuma paid its growers. The parties agreed that Sakuma's expenditures for the Blueberry Field would be non-recourse and unsecured, to be repaid only to the extent there were eventual profits realized — i.e., the difference between each year's annual costs and the value of the blueberries purchased by Sakuma. Thus, Haller Farms would receive no money from the blueberry crops until the debts to Sakuma and Oregon Blueberry were paid in full, with Sakuma being paid first. Mr. Sheafe, who was responsible for informing the other Haller family members of the Blueberry Field's progress, testified that "Sakuma essentially owned the revenue stream coming off the field until that was reduced to zero. . . . [Sakuma] got all the fruit. He sold it and kept the money."

With the exception of 2011, discussed below, Sakuma farmed, managed and paid all costs for the Blueberry Field from 2005 through 2015. Haller Farms gave Sakuma complete control over management of the Blueberry Field and all decisions regarding the amount and types of expenditures made. Sakuma neither consulted nor advised Haller Farms of day-to-day or ongoing expenses that were incurred for the blueberry operation. Haller Farms would typically not know until the end of each calendar year whether Sakuma's blueberry operation generated a profit or loss that would reduce or increase the Sakuma debt. All Sakuma provided Haller Farms regarding the Blueberry Field was an annual income statement showing expenses, income and total annual profits or losses.

During Sakuma's management, one or more of Debtor's predecessor entities provided Sakuma with labor and materials for the blueberry operation and were paid by Sakuma when billed for

-5-

the work and materials provided. Sakuma's payments to the entities were added to the Blueberry Field expenses, and ultimately increased the Sakuma debt owed by Haller Farms.

Under the agreement between Sakuma and Haller Farms, each year, except for 2011, when Sakuma harvested the blueberries it credited itself for the market price based on prices Sakuma paid to other growers. Any revenue that exceeded annual costs was applied to reduce the Sakuma debt; any losses incurred increased the Sakuma debt.

Overall, farming blueberries on the Blueberry Field from 2005 through 2010 was unprofitable. By 2010, the Sakuma debt was nearly $1.3 million.[7] Haller Farms was concerned about the Blueberry Field's accumulating losses and its likelihood of profitability. In an April 2009 email, Mr. Sheafe expressed to the other Haller family members that "cost reduction" would be their focus for the 2009 growing season. In a March 2010 email from Mr. Sheafe to Mr. Storey, Mr. Sheafe stated that it was time to focus on controlling costs, noting that Haller Farms was "dangerously close to the point where we can not catch the expense of accruing payables due to the amount of money due to Sakuma." Mr. Sheafe indicated that blueberry operation costs had been reduced by using Debtor's labor instead of Sakuma's, noting that much of the labor provided by Debtor in 2009 "was not billed to Sakuma" and that "[g]oing forward, [Mr. Staffanson] anticipates providing all labor except harvest labor without requesting

_____

[7] The blueberry operation accrued losses of $274,532 in 2005, $291,788 in 2006, $216,583 in 2007, $298,846 in 2008, $108,703 in 2009 and $39,230 in 2010.

-6-

reimbursement from Sakuma."

At the end of 2015, Sakuma terminated its management of the Blueberry Field. At the time of trial, a different, unrelated entity was growing blueberries there.

**C.    The Blueberry Field - 2011**

The focus of these cross-appeals lies in the transactions that occurred between the parties for the Blueberry Field's 2011 crop year. In 2011, Sakuma was facing financial difficulties and did not want to work the Blueberry Field that year. Deciding that the Blueberry Field "had turned the corner" and was "ready to generate substantial profit," Mr. Staffanson (on behalf of Debtor) negotiated with Sakuma to manage and control the blueberry operation, providing all labor and materials free of charge in exchange for 1/3 of the proceeds of the blueberry harvest based on the prices Sakuma paid to growers (the "2011 Agreement"). The other 2/3 of the proceeds, after deductions for Sakuma's expenses, were to be credited to the accumulated Sakuma debt. Debtor had no obligation to expend any particular amount in growing the 2011 blueberry crop under the 2011 Agreement; it was entirely in Debtor's discretion.

Mr. Sakuma, Mr. Sheafe and Mr. Staffanson all testified that they believed the 2011 Agreement gave Debtor the right to exclusive control over the Blueberry Field and crop, to contract with third parties and to make all decisions on expenditures for farming the field — the same rights Sakuma had in the years 2005-2010 and 2012-2015.

In performing the 2011 Agreement, Debtor expended $395,159.23 on farming blueberries. Following the 2011 blueberry harvest,

Debtor transferred the blueberries to Sakuma.  Pursuant to the 2011 Agreement, Sakuma valued the crop based on the prices it paid to growers and paid 1/3 of that amount ($39,451) to Fairhaven Farms, an entity the bankruptcy court found sufficiently affiliated with Debtor so as to constitute a payment to Debtor. After deducting its expenses of $38,465 from 2/3 of the proceeds, Sakuma applied the remaining proceeds — $40,438 — to reduce the Sakuma debt.

## D.    Trustee's claims against Haller Farms

Trustee filed an adversary proceeding against Haller Farms asserting claims for (1) declaratory judgment, (2) breach of contract, (3) fraudulent transfer (both actual and constructive) and (4) unjust enrichment.  For her first two claims, Trustee alleged that Haller Farms was engaged in a joint venture, partnership agreement or crop share agreement with Debtor to farm blueberries.  She further alleged that Haller Farms was in breach of the parties' agreement by failing to pay Debtor all of the proceeds to which it was entitled.  Trustee later dismissed these claims with prejudice, because she could not prove that a joint venture or crop share agreement to farm blueberries existed between Debtor and Haller Farms.

Haller Farms later moved for summary judgment on Trustee's remaining fraudulent transfer and unjust enrichment claims. Initially, for her unjust enrichment claim, Trustee had alleged that Haller Farms was unjustly enriched by receiving from Debtor at least $1.9 million in contributions to the alleged joint blueberry venture with Haller Farms (which did not exist) without paying over to Debtor any of the business's proceeds.  In

-8-

opposition to Haller Farms' summary judgment motion, Trustee alleged $395,195 in free labor and materials Debtor provided to Sakuma for the Blueberry Field in 2011 benefitted Haller Farms by reducing the Sakuma debt with no payment from Haller Farms.

Trustee argued that Haller Farms had unquestionably received a benefit as a result of Debtor's uncompensated contributions of labor and materials, which served to support either her unjust enrichment or fraudulent transfer claims. As Trustee explained, Haller Farms would begin to make a profit on the blueberry operation once the advances made by Sakuma were paid off. Thus, anything Haller Farms could do to lower production costs was a direct and tangible benefit to Haller Farms; it decreased the amounts owed to Sakuma and advanced the time at which it would begin to see profits from blueberry operations. Therefore, argued Trustee, persuading Debtor to provide free labor instead of having to pay Sakuma for its labor was a direct benefit to Haller Farms. Trustee asserted that Haller Farms was aware of the free labor arrangement with Sakuma based on the correspondence between its members.

Haller Farms argued that Trustee's claim for unjust enrichment failed because no benefit had been conferred upon it. The Blueberry Field had produced only losses, a total of $1.75 million between Sakuma's losses and the $434,158 still owed to Oregon Blueberry. Haller Farms argued that it had never received, and would never receive, any profits or rent proceeds from blueberry operations. At best, argued Haller Farms, it may have been an incidental beneficiary of some nominal, uncompensated labor or services provided by Mr. Staffanson or Debtor to Sakuma,

-9-

but that did not obligate Haller Farms to make restitution. Mr. Staffanson stated that any use of labor or materials by Debtor for the Blueberry Field without reimbursement from Sakuma was limited and done only because he felt a moral obligation to the Haller family for getting them involved in the unprofitable blueberry crop, and because Debtor's successful pickle and cabbage operations were dependant on Haller Farms' continued willingness to lease land to Debtor. Haller Farms further argued that Trustee could not sue on the equitable theory of unjust enrichment for any unpaid-for labor or materials, because that was the subject matter of express contracts between Debtor and Sakuma for the years 2005-2010 and 2012; for 2011, Debtor's contract with Sakuma was 1/3 of the blueberry crop proceeds.

The bankruptcy court granted Haller Farms' first motion for summary judgment as to Trustee's claims for unjust enrichment and actual fraudulent transfer. However, it denied the motion as to Trustee's claim for constructive fraudulent transfer.

With the dismissal of Trustee's claims for unjust enrichment and actual fraudulent transfer, the only issue remaining for trial was whether Trustee could establish a constructive fraudulent transfer claim against Haller Farms based on the alleged transfers of labor and materials to it by Debtor.

**E.    Trial on Trustee's remaining claim for constructive fraudulent transfer**

After a second round of unsuccessful summary judgment motions, the bankruptcy court conducted a two-day trial.

Mr. Staffanson testified extensively about the blueberry operation for 2011. He testified that 2011 appeared to be a good

year for Debtor to take over management of the Blueberry Field; the price of blueberries was on the rise and the plants had matured greatly due to Sakuma's efforts in prior years. Mr. Staffanson testified that he was optimistic about the 2011 blueberry crop, and he believed the 2011 Agreement would be financially beneficial for Debtor. However, Mr. Staffanson testified that, between lower-than-expected prices received, the massive "shock" disease that detrimentally affected the plants that year and Debtor doing "a bad job on cost control," blueberry operations for 2011 were not as profitable as everyone had hoped.

Mr. Staffanson testified that Debtor, not Haller Farms, was the intended beneficiary of the 2011 Agreement. Both Mr. Staffanson and Mr. Sakuma testified that Haller Farms was not consulted before Sakuma and Debtor entered into the 2011 Agreement, and that neither expected Haller Farms to receive any direct monetary benefit from it because Sakuma and Oregon Blueberry had to be paid off before Haller Farms would receive any profits from blueberry operations. However, Mr. Sakuma testified that, ultimately, getting Haller Farms "in a positive cash position to allow that farm to be run by [Mr. Staffanson]" and for Sakuma "to no longer be farmers but the receivers of a raw product that [Sakuma] would turn into market profit" was the "long-term goal" of all three parties.

Finally, Mr. Sheafe testified that Haller Farms did not learn of the 2011 Agreement between Debtor and Sakuma until early 2012. He testified that Haller Farms received no monetary benefit as a result of the 2011 Agreement.

After testimony from the witnesses, the court expressed its

-11-

concern over exactly "what" constituted the transfer or transfers that Trustee was alleging. Was it the entire $395,159 Debtor spent on blueberry operations for 2011, or was it the 2/3 net return on the fruit that went toward reducing the Sakuma debt? Furthermore, was Haller Farms alleged to be the initial transferee, the intended beneficiary or an immediate transferee? The court ordered post-trial briefing on these issues, heard closing argument and took the matter under submission.

**F.   The court's ruling**

The bankruptcy court entered its written Findings of Fact and Conclusions of Law.[8]  The court found that Haller Farms was the intended beneficiary of the 2011 Agreement, and the transfer which was intended to and did benefit Haller Farms was the 2/3 in net proceeds Sakuma received from the 2011 blueberry harvest and applied to reduce the Sakuma debt owed by Haller Farms.

Accordingly, judgment was entered in favor of Trustee and against Haller Farms, jointly and severally, for $40,438.00.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H).  We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1.   Did the bankruptcy court err in determining that Debtor owned the 2011 blueberry crop?

2.   Did the bankruptcy court err in finding that Haller Farms was the intended beneficiary of, and did benefit from, the 2011

---

[8]   The bankruptcy court found that Debtor was insolvent at the time of the transfer in question.  No party has appealed that ruling.

-12-

Agreement?

3.    Did the bankruptcy court err by dismissing Trustee's unjust enrichment claim on summary judgment?

## IV. STANDARDS OF REVIEW

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Decker v. Tramiel (In re JTS Corp.), 617 F.3d 1102, 1109 (9th Cir. 2010).  Factual findings are clearly erroneous if they are illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).  Whether a party is a "transferee" is a question of fact. See First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.), 974 F.2d 712, 722 (6th Cir. 1992).

We review de novo the bankruptcy court's decision to grant summary judgment. Salven v. Galli (In re Pass), 553 B.R. 749, 756 (9th Cir. BAP 2016).

## V. DISCUSSION

A bankruptcy trustee may bring an action to avoid a prepetition transfer that is alleged to be constructively fraudulent under § 548(a)(1) or applicable state law as provided in § 544(b).  In relevant part, § 548(a) provides:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —
>
> . . . .
>
> (B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I)  was  insolvent  on  the  date  that  such

-13-

transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

§ 548(a)(1). In other words, to avoid a constructively fraudulent transfer under § 548(a)(1)(B), the trustee must prove: (1) the transfer involved property of the debtor; (2) the transfer was made within two years of the bankruptcy filing; (3) the debtor did not receive reasonably equivalent value for the property transferred; and (4) the debtor was insolvent, made insolvent by the transaction, operating or about to operate without sufficient capital or unable to pay debts as they become due. Hasse v. Rainsdon (In re Pringle), 495 B.R. 447, 462-63 (9th Cir. BAP 2013). Washington law is substantially similar. See RCW 19.40.041(a)(2) and RCW 19.40.051(a).[9]

---

[9] RCW 19.40.041(a)(2) provides for avoidance if the debtor made the transfer or incurred the obligation:

(2) without receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor

(I) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or

(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they become due.

RCW 19.40.041(a)(2)(I) and (ii).

RCW 19.40.051(a) provides that the trustee may avoid a transfer or obligation if the debtor:

Made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

-14-

**A. The bankruptcy court did not err in determining that Debtor owned the 2011 blueberry crop.**

Neither party contests the bankruptcy court's finding that Debtor was insolvent at the time of the transfer at issue or that the transfer was made within two years of the bankruptcy filing. The dispute lies in "what" Debtor transferred and whether Haller Farms was the "entity for whose benefit the transfer was made."

The bankruptcy court found that, by Debtor taking over the role of farmer, managing and controlling the blueberry operation for 2011, as Sakuma had done in years prior, Debtor owned and controlled the disposition of the 2011 blueberry crop it produced. Trustee contends the bankruptcy court erred when it found that Debtor, as opposed to Haller Farms, owned the 2011 blueberry crop. She maintains that no evidence in the record existed to support this finding. We disagree.

As a threshold matter for her constructive fraudulent transfer claim, Trustee had to prove that "property of the debtor" was transferred. A transfer of the debtor's property that otherwise would have been property of the estate is a prerequisite for a fraudulent transfer action under either § 544 or § 548. Wood v. Bright (In re Bright), 241 B.R. 664, 666 n.3 (9th Cir. BAP 1999); Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP), 408 B.R. 318, 337 (Bankr. N.D. Cal. 2009) ("both the 'property' and 'transfer' elements apply whether the claim is one for actual or constructive fraudulent transfer"). The existence of an interest in "property" is a question of state law, while the issue of whether such property was "transferred" is one of federal law. In re Bright,

-15-

241 B.R. at 666 n.3. See also Barnhill v. Johnson, 503 U.S. 393, 398 (1992) (in the absence of controlling federal law, "property" and "interests in property" are creatures of state law); Butner v. United States, 440 U.S. 48, 55 (1979). Therefore, to determine whether the 2011 blueberry crop was property of Debtor, we turn to Washington law.

No written contract existed between Sakuma and Haller Farms for any of the years when Sakuma managed and controlled the Blueberry Field. Further, the 2011 Agreement between Sakuma and Debtor was not memorialized by a written contract. Nonetheless, Mr. Sakuma and Mr. Sheafe testified that Sakuma had complete and exclusive control over the Blueberry Field and resulting crops — the actual fruit harvested, not the plants — from 2005-2010 and 2012-2015, and they and Mr. Staffanson testified that Debtor, by obtaining Sakuma's rights over the Blueberry Field in 2011, had complete and exclusive control over it and the resulting crop for 2011. No party testified to the contrary. At one point, as Trustee notes, Mr. Sakuma also testified that the harvested fruit belonged to Haller Farms. However, which entity owned the fruit is a legal conclusion for the court to determine. See Cermak v. Babbitt, 234 F.3d 1356, 1361 (Fed. Cir. 2000) (nature of property interests is a question of law); Tarabishi v. McAlester Reg'l Hosp., 827 F.2d 648, 652 (10th Cir. 1987) ("Whether the facts establish a property interest is a question of law."). Therefore, the bankruptcy court was free to disregard Mr. Sakuma's contrary testimony.

Washington recognizes oral contracts. Lopez v. Reynoso, 129 Wash. App. 165, 171 (2005) (In Washington, an agreement "can

-16-

be entirely oral, entirely in writing, or partly oral and partly in writing."). Further, the oral agreements here do not fall within the Statute of Frauds. See RCW 19.36.010.[10] Thus, the oral agreements between the parties were valid and enforceable and gave Debtor a property interest in the 2011 blueberry crop.

Moreover, because Debtor was a cash lessee of the Blueberry Field from Haller Farms and a rightful tenant in possession, Debtor held title to, and the absolute right to sell, the blueberry crop it grew and harvested in 2011.[11] See Loudon v.

---

[10] RCW 19.36.010. Contracts, etc., void unless in writing.

In the following cases, specified in this section, any agreement, contract, and promise shall be void, unless such agreement, contract, or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith, or by some person thereunto by him or her lawfully authorized, that is to say: (1) Every agreement that by its terms is not to be performed in one year from the making thereof; (2) every special promise to answer for the debt, default, or misdoings of another person; (3) every agreement, promise, or undertaking made upon consideration of marriage, except mutual promises to marry; (4) every special promise made by an executor or administrator to answer damages out of his or her own estate; (5) an agreement authorizing or employing an agent or broker to sell or purchase real estate for compensation or a commission.

[11] Although the parties did not offer into evidence a written lease for the Blueberry Field from 2011 between Debtor and Haller Farms as they did with other years, it appears the parties did enter into a lease for that year based on correspondence between them. The language in the leases between the parties for the years 2007-2009 states that the amount of rent to be paid by Debtor was "an amount calculated as the result of blueberry crop proceeds from fruit sales less repayment of Sakuma paid field expense for maintenance and improvements and after repayment of accrued payables due Sakuma and Oregon Blueberry, if any." Thus, these prior leases were "cash" leases as opposed to "crop share agreement" leases, which could result in a different outcome as to ownership of the fruit once harvested. See 21A Am. Jur. 2d Crops § 23 (2017). Presumably, and no one has shown otherwise, the 2011 Blueberry Field lease was also a "cash" lease with the same payment terms as prior leases.

-17-

Cooper, 3 Wash. 2d 229, 240 (1940) (occupier of land is the owner of all crops harvested during the term of his occupancy, whether the occupant be a purchaser in possession, a tenant in possession, or a mere trespasser in possession, holding adversely); Benhart v. Gorham, 14 Wash. App. 723, 724 (1976) ("As between lessor and lessee, it is the general rule in Washington that title to the crops follows actual possession of the land"); 21A Am. Jur. 2d Crops § 23 (2017) ("Tenants who rent land for cash are owners of the crops and have an absolute right to sell them").

Accordingly, the bankruptcy court did not err when it determined that Debtor owned the 2011 blueberry crop and had exclusive control over its disposition.

Trustee further argues that, because the bankruptcy court erred in determining that Debtor owned the 2011 blueberry crop, it erroneously concluded that the $395,159 it expended in labor and materials for the Blueberry Field in 2011 was not a fraudulent transfer to Haller Farms but rather an investment of its own labor and materials into its own blueberry crop. Because we conclude that the court did not err in determining that Debtor owned the 2011 blueberry crop, Trustee's argument necessarily fails.

**B. The bankruptcy court did not err in finding that Haller Farms was the intended beneficiary of the 2011 Agreement between Debtor and Sakuma.**

To the extent a transfer is avoided under § 548, a trustee may recover the property or the value of the property from "the entity for whose benefit such transfer was made." § 550(a)(1).[12]

---

[12] Section 550(a)(1) provides, in relevant part:

(continued...)

-18-

"The phrase 'or the entity for whose benefit such transfer was made' refers to those who receive a benefit as a result of the initial transfer from the debtor — not as the result of a subsequent transfer." Danning v. Miller (In re Bullion Reserve of N. Am.), 922 F.2d 544, 547 (9th Cir. 1991). "[I]n transferring the avoided funds, the debtor must have been motivated by an intent to benefit the individual or entity from whom the trustee seeks to recover. It is not enough that an entity benefit from the transfer; the transfer must have been **made for his benefit**." Id. (emphasis in original). Additionally, "an entity need not actually benefit, so long as the transfer was **made** for his benefit." Id. (emphasis in original).

Haller Farms contends the bankruptcy court erred in concluding that the 2011 Agreement between Debtor and Sakuma was intended to benefit, and did benefit, Haller Farms. Haller Farms maintains that it was merely an incidental and remotely contingent beneficiary of the 2011 Agreement and therefore not liable to Trustee. We disagree.

At trial, Mr. Staffanson and Mr. Sakuma testified that they believed and intended that Debtor and Sakuma would be the only intended beneficiaries of the 2011 Agreement, because Haller Farms

[12](...continued)
(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from —

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]

-19-

could not receive any revenue from the Blueberry Field until approximately $1.7 million in debt was repaid to Sakuma and Oregon Blueberry from crop revenues. The men also testified that they caused their companies to enter into the 2011 Agreement because they believed the blueberry operation would be profitable in 2011 and both would make money on the deal.

Based on the evidence that blueberry yields were trending upward, that net losses from blueberry operations were decreasing from 2008-2010 and that it was anticipated that 2011 would be a good crop year, the bankruptcy court found Mr. Staffanson's belief that operating expenses for 2011 would be less than the value of the blueberry harvest was optimistic, but reasonable. However, to the extent Mr. Staffanson believed that under the terms of the 2011 Agreement Debtor could profit from or break even on the 2011 blueberry harvest, the court found his testimony not credible. The court found it was not at all reasonable for a sophisticated farmer to believe that 1/3 of the blueberry harvest proceeds would equal or exceed the costs of producing the 2011 blueberry harvest. Furthermore, Mr. Staffanson had testified that he entered into the 2011 Agreement, at least in part, due to a moral obligation he felt to the Haller family. For these reasons, the court found that the 2011 Agreement was intended to benefit Haller Farms and that Haller Farms did benefit from Debtor's transfer of the 2/3 of net proceeds from the 2011 blueberry crop to Sakuma.

Where two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous. Anderson v. City of Bessemer City, 470 U.S. 564, 573-75 (1985); Ng v. Farmer (In re Ng), 477 B.R. 118, 132 (9th Cir. BAP 2012). In

-20-

addition, we give great deference to the bankruptcy court's factual findings when based upon its determinations as to the credibility of witnesses. In re Retz, 606 F.3d at 1196. Past history reveals that the blueberry operation was a financial failure. Even though losses were declining marginally from 2008-2010, the chance of Debtor actually making money under the 2011 Agreement was remote. Moreover, Mr. Staffanson admitted that he felt a moral obligation to the Haller family to help curb their losses on the failing blueberry venture that his former business partner got them involved in. Considering this and the testimony from Mr. Sakuma and Mr. Staffanson, some of which the bankruptcy court found not credible, we cannot conclude that the court's finding that Haller Farms was the intended beneficiary of the 2011 Agreement and that it benefitted from Debtor's transfer of the 2/3 portion of net crop proceeds to Sakuma by reducing the Sakuma debt was illogical, implausible or without support in the record.

Even if the debt reduction here was a "hypothetical" benefit to Haller Farms, as it contends, because it made a small dent in a massive debt that will never be repaid to Sakuma, we must uphold the bankruptcy court's finding. Haller Farms did not actually have to benefit from the 2011 Agreement and the transfer of the 2/3 of net crop proceeds to Sakuma to be liable to Trustee. The fact that the 2011 Agreement and transfer to Sakuma was **made** for Haller Farms' benefit is sufficient to establish its liability under § 550(a). In re Bullion Reserve of N. Am., 922 F.2d at 547 (entity need not actually benefit as long as the transfer was made for its benefit).

**C.    The bankruptcy court did not err by dismissing Trustee's unjust enrichment claim on summary judgment.**

Trustee contends the bankruptcy court erred by dismissing her unjust enrichment claim on summary judgment because she offered evidence supporting each of the claim's elements under Washington law.  The bankruptcy court determined that the record lacked any evidence that Debtor requested or expected either Sakuma or Haller Farms to pay for any uninvoiced labor and materials it provided. Because of this, the court found that Debtor was nothing more than a mere "volunteer" to the blueberry operation with respect to any uninvoiced, uncompensated services, which precluded a claim for unjust enrichment for the years other than 2011.

As for 2011, the court found that Debtor did not expect to be compensated for anything beyond the 1/3 sale proceeds split it contracted for.  Therefore, regardless of whether Haller Farms benefitted from Debtor's uninvoiced, uncompensated services for that year, the court found that retention of the benefit was not unjust under the circumstances.  Trustee contests only the court's decision respecting the $395,159 Debtor expended in labor and materials for the Blueberry Field in 2011.

"Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." Young v. Young, 164 Wash. 2d 477, 484 (2008).  To prevail on her unjust enrichment claim, Trustee had to establish that:  (1) Debtor conferred a benefit on Haller Farms; (2) Haller Farms knew of the benefit; and (3) Haller Farms accepted or kept the benefit under inequitable circumstances.  Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.,

-22-

61 Wash. App. 151, 159-60 (1991).

"A person can be enriched by merely receiving a benefit. However, the mere fact that a person benefits another is not sufficient to require the other to make restitution. It is well established that unjust enrichment and liability only occur where money or property has been placed in a party's possession such that in equity and good conscience the party should not retain it." Lynch v. Deaconess Med. Ctr., 113 Wash. 2d 162, 165-66 (1989) (internal citations omitted). To be unjust as between the two parties, the party conferring the benefit must not be a volunteer. Id. at 165 (the enrichment of the defendant must be unjust and the plaintiff cannot be a mere volunteer).

Trustee makes much of the bankruptcy court's finding that Debtor was a "volunteer" to the blueberry operation with respect to any uninvoiced, uncompensated services. However, that does not appear to be the court's ruling with respect to the $395,159 Debtor expended in labor and materials for the Blueberry Field in 2011. Furthermore, whether the court should have made that factual finding on summary judgment is debatable. In any event, the record does not support Trustee's unjust enrichment claim.

Under the 2011 Agreement, Debtor provided $395,159 in labor and materials for the Blueberry Field. The record and the law at the time of Haller Farms' first summary judgment motion reflect that Debtor owned and controlled the blueberry crop for that year. Its application of labor and materials to the Blueberry Field was for the purpose of producing its own blueberry crop. Debtor received payment for that labor and materials in the form of 1/3 of the 2011 crop proceeds, which is exactly what it contracted for

-23-

with Sakuma. Even though in hindsight Debtor overspent to grow the 2011 crop, the record does not support the inference that, whatever benefit Haller Farms may have received from Debtor's labor and materials on the Blueberry Field that year (which would not be the entire $395,159 Trustee was requesting in any event), it would be unjust or inequitable for Haller Farms to retain it without payment.

Accordingly, because the elements of Trustee's unjust enrichment claim were not genuinely disputed, the bankruptcy court did not err by granting Haller Farms' first summary judgment motion and dismissing Trustee's claim.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.

-24-